UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **GINA CHRISTOPHERSON, individually and on behalf of all those similarly situated**<br><br>Plaintiff,<br><br>- against -<br><br>**CINEMA ENTERTAINMENT CORPORATION,**<br><br>Defendant. | Case No.   0:23-cv-03614<br><br>**COMPLAINT – CLASS ACTION**<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiff Gina Christopherson ("Christopherson" or "Plaintiff"), individually and on behalf of the class defined below (the "Class"), through their undersigned counsel, brings this Class Action Complaint against Defendant Cinema Entertainment Corporation ("CEC" or "Defendant").

1. Plaintiff brings this class action against Defendant for violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA"). The VPPA protects consumers of video or "similar audio visual materials" from having information about what they watched being shared with anyone other than the provider of those videos. 18 U.S.C. § 2710(a)(4). The legislative history is clear that "similar audio visual materials" is broad and includes, but is not limited to, "laser disks, open-reel movies, or CDI technology." *See* S. Rep. No. 100-599, 100th Cong., 2d Sess., reprinted at 1988 U.S.C.C.A.N. 4342-1.

2. CEC operates under its trade name "CEC Theatres." CEC is a private company which operates over 150 screens in Minnesota, Iowa, Wisconsin and Nebraska. CEC's company headquarters are located in St. Cloud, Minnesota.

3. CEC owns and operates a website, www.cectheatres.com (the "CEC Website"), where consumers can watch trailers, browse showtimes, and purchase movie tickets. Through its website CEC has been tracking what trailers its consumers watch, what movies they look at, and—most importantly—what movies they purchase tickets to watch. Without the knowledge and permission of its consumers, CEC provides that personal information to Meta Platforms, Inc. ("Meta"), formerly known as Facebook—together with their Facebook.com ("Facebook") account information—so that Meta can use that information to directly market to each consumer's personal Facebook account. This is a direct, gross, and obvious breach of the VPPA.

4. The VPPA provides a federal private cause of action against video service providers, including movie providers like CEC, "who knowingly disclose[ ], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

5. "Personally identifiable information" ("PII") is defined by the VPPA as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

6. CEC violated, and continues to violate, the VPPA by knowingly and intentionally disclosing their consumers' PII when they purchase movie tickets and watch trailers on the CEC Website. Specifically, every time a consumer who is also a logged-in Facebook user—over 70% of all internet users have a Facebook account—purchases a movie ticket or watches a trailer on the CEC Website, CEC discloses to Meta the name of the movie title the specific Facebook user purchased a ticket to see or the name of the trailer the user watched. Because many, if not most, Facebook users stay logged-in to Facebook for prolonged periods of time, discovery will show

that CEC has transmitted PII to Meta/Facebook for thousands of consumers on tens of thousands of occasions—if not more—in violation of the VPPA.

7. The VPPA provides consumers whose privacy has been invaded with the right to recover statutory damages of $2,500 per violation, plus attorneys' fees and costs. Plaintiffs bring this action to achieve redress on behalf of themselves and others who were similarly injured by Defendant's unlawful conduct.

## PARTIES

8. Plaintiff Gina Christopherson is a citizen of Minnesota and resident of Kensington.

9. Defendant CEC is a privately held Minnesota corporation with a headquarters at 1621 Division Street, Waite Park, MN 56387.

## JURISDICTION AND VENUE

10. This Court has original federal question and subject matter jurisdiction pursuant to 28 U.S.C. §1331 and the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d). This action arises under the laws of the United States, Plaintiff alleges and believes that there are (i) more than 100 class members; (ii) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (iii) at least one member of the Class is from a different state than the Defendant.

11. This Court has personal jurisdiction over the parties because Defendant, at all times relevant hereto, has been a Minnesota corporation with its principal place of business in Minnesota.

12. Venue is proper under 28 U.S.C §1391 because Defendant's principal place of business in this District and a substantial part of the events giving rise to the claims occurred in this District.

**FACTUAL BACKGROUND**

I. **THE VPPA AND ITS PROHIBITION ON CEC DISCLOSING ITS CUSTOMERS' MOVIE WATCHING HISTORY TO THIRD PARTIES**

13. On July 1, 1987, President Ronald Reagan nominated Judge Robert Bork to fill the vacancy on the Supreme Court of the United States. Judge Bork's nomination infamously descended into the most contentious confirmation hearings in history.

14. One positive ramification of Judge Bork's failed candidacy, however, was the passage of the VPPA in 1988. In response to Judge Bork's nomination, the Washington City Paper obtained and published Judge Bork's video rental history from his local video-tape rental store. While Judge Bork's rentals were anodyne, their publication in a newspaper spooked Congress.

15. A bipartisan group of Senators, led by Patrick Leahy (D-VT), crafted the VPPA to outlaw the disclosure the personal viewing habits of Americans without their permission. In so doing, Congress was remarkably prescient about the future of digital information sharing. As Senator Leahy explained:

> In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong. S. Rep. 100-599, at 5-6, 100th Cong., 2d Sess., reprinted at 1988 U.S.C.C.A.N. 4342-1 (internal ellipses and brackets omitted).

16. VPPA protects consumer privacy by providing for a federal cause of action against "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). A "video tape service provider" is defined as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes *or similar audio visual materials*." 18 U.S.C. § 2710(a)(4) (emphasis added). The legislative history shows that

"similar audio visual materials" is broad—the Senate Report noted that the term includes "laser disks, open-reel movies, or CDI technology." *See* S. Rep. No. 100-599, 100th Cong., 2d Sess., reprinted at 1988 U.S.C.C.A.N. 4342-1. This is not an exhaustive list.

17.     Courts have interpreted the VPPA to apply to modern technologies and "to cover more than just the local video rental store." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017). Specifically, courts have found that "Congress was concerned with protecting the confidentiality of private information about viewing preferences regardless of the business model or media format involved." *In re Hulu Priv. Litig.*, No. 11-cv-03764 LB, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (citing S. Rep. No. 100-599 at 1).

18.     The VPPA "codifies a context-specific extension of the *substantive* right to privacy. . . . [I]t protects generally a consumer's substantive privacy interest in his or her video-viewing history." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (emphasis in original). "Accordingly, *every* disclosure of an individual's 'personally identifiable information' and video-viewing history offends the interests that the statute protects." *Id.* (emphasis in original).

19.     By selling tickets to prerecorded movies, providing trailers to those movies, and delivering those movies to consumers in movie theaters, CEC is a "video tape service provider" under the VPPA.

20.     By purchasing tickets to the movies, watching trailers on CEC's website, and watching the movies in CEC's theaters, Plaintiff and Class members are "consumers" under the VPPA.  18 U.S.C. § 2710(a)(1).

21.     Video tape service providers, including CEC, are prohibited from knowingly disclosing, to any person, information identifying any consumers as having requested or obtained specific video materials or services.  Here, that means CEC cannot disclose to third-parties

information regarding the specific movies for which a consumer purchased tickets or watched trailers.

22. The prohibition on disclosing this information extends to movie ticket purchases made online through CEC's virtual box office. Since the VPPA was passed, consumers have gone from purchasing tickets with cash at a movie theater to purchasing tickets from the comfort and privacy of their homes using the internet. Technological change has thus enabled movie theaters, such as CEC, to compile electronic records of transactions that associate specific consumers with the movies they are purchasing tickets for. Consumers' privacy interests in these records are protected by the VPPA because CEC is a "video tape service provider" and Plaintiff and the Class members are "consumers" of those video tape services under the statutory definition.

23. Moreover, the systematic disclosure of such transactions causes the exact harms that spurred Congress to pass the VPPA in the first place: a violation of individuals' privacy interest in the movies they choose to watch being disclosed to a third party without their express, informed consent.

II. **CEC KNOWINGLY DISCLOSES ITS CONSUMERS' PII TO FACEBOOK**

24. Facebook has 3.03 billion monthly active users, including 243.5 million in the United States—approximately 70% of the country's total population.[1]

25. Facebook's policies require users to use their real identities when signing up on the platform; meaning users are only allowed one account and must use the name they use in "everyday life," including first and last name. Users must also provide their birthday and other identifying information.[2]

---

[1] *See* https://www.demandsage.com/facebook-statistics/.

[2] *See* https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/.

26. When a person signs up for Facebook, Facebook assigns them a unique Facebook ID number. The Facebook ID number is a digital address that allows any ordinary person to identify the Facebook user. For example, if one runs a Google search of the word "Facebook" and a given Facebook ID number, the Facebook user's profile will return in the search. Even more straightforward, a person can go directly to a user's Facebook profile by appending the Facebook ID to the end of "facebook.com" and typing it into the address bar of any internet browser.

27. When a user logs into Facebook using an internet browser, such as Google Chrome or Microsoft Edge, Facebook/Meta places several cookies on the user's browser.

28. A "cookie" is a piece of code placed on a browser by a server that receives information stored by the cookie. A cookie can store different types of information, but the basic function is to identify a) the user and b) the website the user visited that placed the cookie to begin with.

29. One of the cookies placed by Meta on a user's browser upon login is the "c_user" cookie which contains the user's Facebook ID number. This cookie remains on a user's browser as long as they do not hit "Log Out" when they leave Facebook. Even if the user never visits Facebook.com using that browser again, the cookie will remain on the device for one year since the user's last visit to Facebook.

30. The long life of the c_user cookie is intentional—not only does the cookie allow Meta and Facebook to identify users when they visit Facebook.com, it also allows Facebook to track the user's activity across the web on the same browser. Because the Facebook ID is specific to a person, unlike an IP address for example, Facebook can match up a user's activity across devices using different browsers. This enables Meta and Facebook to know, for example, that a

single user is accessing the internet from a cell phone, a laptop, and a tablet. Meta can compile a comprehensive user profile across devices and see which websites were visited on each device.

31. By tracking a specific user's movements across the web and across devices, all enabled by the Facebook ID, Meta collects enormous amounts of data regarding a user's interests, behavior, and connections. The quantity and quality of this data allows Meta to generate billions in advertising revenue—allowing businesses to target users with specific interests, target advertisements to specific users who visited their site but did not complete a purchase, and to analyze the types of Facebook users that are visiting their site by leveraging user demographics, interests, and behaviors on other websites.

32. Businesses, including CEC, are able to access this data from Meta by participating in Meta's collection of data using the "Meta Pixel" (formally "Facebook Pixel") program.

33. Pixels, also known as "web beacons," are often small transparent images that an internet browser downloads like any other image on a website. When a user visits a web page of a business which has installed the Meta Pixel, the pixel is programmed to contact the Facebook ad server.

34. The business installing the Meta Pixel can program it to contact Facebook when users engage in specific conduct on the business's website, such as when a user places an item in their shopping cart, makes a purchase of an item or a service, clicks a certain button, or otherwise interacts with the website. When the user has an active c_user cookie on their browser, and when the Meta Pixel is programmed by the website owner to convey information about specific conduct (referred to as "events"), Facebook receives the event information along with the user's Facebook ID, thus connecting the specific Facebook user ID with the event-related information sent by the website.

35. If a business does not install the Meta Pixel, information about the user's actions on the website is not communicated to Facebook or Meta.

36. CEC and other businesses using the Meta Pixel know that Facebook and Meta can identify the Facebook users visiting their websites. The value for the business in programming their website with the Meta Pixel is derived from Facebook's ability to identify the website visitors and link them to Facebook data on their interests, behaviors, and connections, and to allow the business to target or retarget advertisements to specific users. This enables businesses to, for example, target users who have purchased one product with advertisements for similar products, or companion products. One of the primary purposes of the Meta Pixel for businesses is to enable them to engage in remarketing campaigns where users who have engaged in specific behaviors on their website can be targeted with advertisements designed to encourage a subsequent behavior. For example, a consumer who placed an item in their "cart" might be targeted with remarketing ads for that item until the user completes the purchasing process.

37. At an unknown date, but at least by December 2019, CEC installed the Meta Pixel on its website—both for watching trailers and on the booking page for movie ticket purchases.

38. CEC programmed the Meta Pixel to collect and transmit to Facebook information about the online conduct of consumers on the CEC website. In particular, CEC installed and programmed the Meta Pixel to collect and transmit to Facebook the name of the movie that each consumer purchased a ticket for.

39. CEC also programmed the Meta Pixel to collect and transmit to Facebook the name and location of the theater where the consumer will watch the movie.

40. CEC also programmed the Meta Pixel to collect and transmit to Facebook the name of the movie that each consumer watched a trailer for.

41. CEC programmed its website to send this information—the name of any movie purchased, the name and location of the theater where it will be watched, and the name of any movie trailer watched—to Facebook along with the consumer's unique Facebook ID contained in the c_user cookie. This information and the Facebook ID are sent at the same time.

42. Under the VPPA, "personally identifiable information" ("PII") is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The Facebook ID and the information about what movies the consumer purchased, where the consumer watched the movies, and what trailers the consumer viewed, are PII under the VPPA. *See, e.g. Lebakken v. WEBMD, LLC*, No. 1:22-cv-644-TWT, 2022 WL 16716151, at *4 (N.D. Ga. Nov. 4, 2022) (finding alleged disclosure of plaintiff's "Facebook ID and email address in connection with her video viewing information to Facebook," "constituted a disclosure of PII, supporting a plausible claim under the VPPA" and denying motion to dismiss).

43. By deliberately programming its website to send this information to Facebook, CEC knowingly chose to disclose its consumers' PII to Facebook. Indeed, from a single transmission, an ordinary person—and certainly Facebook and its employees—would be able to identify the consumer as having requested and obtained specific video materials (movies or trailers) from CEC.

44. CEC has programmed its website to take advantage of the fact that Meta and Facebook know who their users are as they browse the web. CEC informs Facebook which movies a Facebook user has purchased tickets for while knowing that the information is linked to a specific consumer and that the information provided is sufficient to "identif[y] a person as having requested

or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

45. By systematically sending this information to Facebook, CEC violates consumers' right to privacy in their video-viewing history and their interests in retaining control over their personal information.

III. **CEC SHARED CHRISTOPHERSON'S PII WHEN SHE PURCHASED MOVIE TICKETS ON CEC'S WEBSITE**

46. Plaintiff Christopherson has had a Facebook account since 2009. Christopherson uses her Facebook account on a daily basis.

47. In July 2023, Christopherson accessed the CEC Website and watched trailers. In the subsequent days, Christopherson's Facebook page began showing her advertisement for those films and similar films.

48. On July 14, 2023, Christopherson accessed the CEC Website through her Google Chrome ("Chrome") browser and purchased movie tickets.

49. Christopherson was logged in to her Facebook account in Chrome at all times that she accessed the CEC Website.

50. When Christopherson watched movie trailers on the CEC Website in July 2023, CEC shared the name of the movie trailer Christopherson watched with Facebook along with her Facebook ID.

51. When Christopherson purchased the movie tickets on the CEC Website on July 14, 2023, CEC shared the name of the movie Christopherson purchased tickets for with Facebook along with her Facebook ID.

52. Thus, CEC knowingly disclosed Christopherson's PII to Facebook when she purchased movie tickets and watched trailers on the CEC Website.

53. By disclosing this information to Facebook, CEC violated Plaintiff Christopherson's right to privacy in her video-viewing history and her interest in retaining control over her personal information.

54. On at least two prior occasions since January 2022, Christopherson accessed the CEC Website to purchase movie tickets. On each of those occasions, CEC shared Christopherson's PII with Facebook in violation of the VPPA.

55. Christopherson has not purchased movie tickets on CEC's Website since learning of CEC's conduct. Christopherson still desires to use this service and would purchase movie tickets on the CEC Website again if she knew that CEC would not share her video viewing information with third parties.

## IV. CLASS ACTION ALLEGATIONS

56. Plaintiff brings claims on behalf of herself, individually, and on behalf of a class of all Facebook users in the United States who purchased movie tickets or watched movie trailers on the CEC Website where, within the statute of limitations, CEC disclosed to Facebook the identity of the user and the movie the user purchased tickets for or watched a trailer for (the "Class").

57. Numerosity: Members of the Class are so numerous that joinder of all Class members is impracticable. Given the volume of Defendant's business, there are thousands of Class members, likely tens of thousands.

58. Commonality: This case presents common questions of law and fact, including but not limited to:

   a. Whether CEC knowingly installed the Meta Pixel on its website and programmed it to collect information, including the movie titles that consumers purchased tickets for or watched trailers for;

      b.   Whether CEC's use of the Meta Pixel to collect and share consumer information with Meta and Facebook violated the VPPA;

      c.   Whether CEC is a "video tape service provider" under the VPPA;

      d.   Whether CEC disclosed Class Members' PII to Meta and Facebook.

59.    Typicality: Plaintiff's claims are typical of the members of the Class. Plaintiff and all members of the Class visited the same website, programmed in the same way by CEC, and had the same information sent to Facebook.

60.    Adequacy: Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff and her experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Class.

61.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the VPPA. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claim for each violation ($2,500) is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

62. Class certification is also appropriate for equitable or injunctive relief because Defendant has acted or refused to act on grounds that apply generally to the Class such that final injunctive relief is appropriate respecting the Class as a whole.

63. In view of the complexities of the issues and the expenses of litigation, the separate claims of individual Class members are insufficient in amount to support separate actions.

64. Yet, the amount which may be recovered by individual Class members will be large enough in relation to the expense and effort of administering the action to justify a class action. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

**COUNT I**
**VIOLATION OF THE VPPA (18 U.S.C. § 2710, *et seq*.)**

65. Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

66. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

67. Defendant is a "video tape service provider" because it sells movie tickets to consumers on the CEC Website and delivers pre-recorded movies to consumers in movie theaters, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

68. Defendant is also a "video tape service provider" because it provides movie trailers to consumers in order to advertise the movies it sells. Thus, Defendant gains substantial pecuniary benefit by leveraging its video clips, the movie trailers, for revenue.

69. Plaintiff and the Class are "consumers" because they purchased movie tickets, and watched trailers for those movies, on the CEC Website. 18 U.S.C. § 2710(a)(1).

70. Using the Meta Pixel program Defendant disclosed Plaintiff's and the rest of the Class Members' PII to Facebook. Defendant transmitted the Class Members' Facebook ID and the name of the movie they were purchasing tickets for and watching trailers for in a single transmission, to Facebook. This information sufficiently permits an ordinary person—and certainly Facebook and its employees—to identify a specific individual's video viewing behavior.

71. Plaintiff and the rest of the Class Members did not consent to allow Defendant to disclose their PII to third parties.

72. On behalf of herself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interest of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA; (iv) punitive damages; and (v) reasonable attorneys' fees and costs and other litigation expenses. 18 U.S.C. § 2710(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, seeks the following relief:

A. Determining that this action may proceed as a class action;

B. Designating Plaintiff as the class representative of the Class;

C. Designating Plaintiff's counsel as counsel for the Class;

D. Issuing proper notice to the Class at Defendant's expense;

E. Declaring that Defendant violated the VPPA;

F. Awarding statutory damages as provided by the VPPA;

G. Granting appropriate injunctive relief;

H. Awarding reasonable attorneys' fees and costs and expenses; and

I.  Granting such other and further relief as the Court may deem appropriate and just.

## JURY DEMAND

Plaintiff, on behalf of herself and the Class, demands a trial by jury on all issues triable by a jury.

Dated: November 22, 2023

Respectfully submitted,

FAEGRE DRINKER BIDDLE & REATH LLP

*/s/ Michael F. Cockson*
Michael F. Cockson (#280549)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile:  (612) 766-1600
Michael.Cockson@faegredrinker.com

-and-

SADIS & GOLDBERG LLP

Ben Hutman (pro hac vice pending)
551 Fifth Avenue, 21st Floor
New York, New York 10176
Telephone:  (212) 947-3793
Email: bhutman@sadis.com

*Attorneys for Plaintiff Gina Christopherson*