UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| GINA CHRISTOPHERSON, individually and on behalf of all those similarly situated, | Case No. 23-CV-3614 (NEB/LIB) |
| Plaintiff, | ORDER ON MOTION TO DISMISS |
| v. | |
| CINEMA ENTERTAINMENT CORPORATION, | |
| Defendant. | |

Gina Christopherson brings this putative class action against Cinema Entertainment Corporation ("CEC"), which owns and operates movie theaters and a corresponding website. On the website, consumers can watch movie trailers and purchase movie tickets. Christopherson claims that CEC programmed the site to track and share consumer behavior with Meta Platforms, Inc. CEC did not obtain consumers' consent to share this information with Meta, so Christopherson, as a website user, alleges violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

CEC moves to dismiss the complaint, presenting issues of statutory interpretation about whether a movie theater operator qualifies as a "video tape service provider" under the VPPA. The Court determines that it does not, and so the motion is granted.

## BACKGROUND[1]

CEC owns and operates movie theaters in Minnesota, Iowa, Wisconsin, and Nebraska. (Compl. ¶ 2.) On CEC's website, consumers can watch trailers, browse showtimes, and purchase movie tickets. (*Id.* ¶ 3; *but see* ECF No. 19 at 8[2] n.1 (asserting that consumers cannot in fact purchase tickets on CEC's website).) Sometime before December 2019, CEC installed on its website the "Pixel" program that Meta—formerly known as Facebook—offers to website operators to allow them to track the actions of consumers on their websites. (Compl. ¶¶ 3, 32, 34, 37.) CEC programmed Meta Pixel to collect and transmit to Meta (1) the name of the movie for which the consumer bought a ticket, (2) the name of any movie for which the consumer watched a trailer, and (3) the consumer's Facebook ID, among other information. (*Id.* ¶¶ 38–41.)

In 2023, Christopherson accessed CEC's website and watched movie trailers on it. (*Id.* ¶ 47.) Using Meta Pixel, CEC's website transmitted to Meta the name of the trailer that Christopherson watched along with her Facebook ID. (*Id.* ¶ 50.) Christopherson's Facebook page began showing her advertisements for those movies and similar movies. (*Id.* ¶ 47.) Christopherson later returned to CEC's website and bought movie tickets. (*Id.* ¶ 48.) CEC transmitted that information to Meta as well. (*Id.* ¶ 51.)

---

[1] The Court draws the following background from the complaint, accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of the nonmovant. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014).

[2] Page citations to the parties' briefs reference ECF page numbers unless otherwise noted.

Christopherson sued CEC on behalf of a class, asserting that it violated the VPPA by disclosing her information to Meta without her consent. CEC now moves to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## ANALYSIS

### I. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must accept as true all plausible factual allegations and draw all reasonable inferences in favor of the non-moving party. *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### II. VPPA

Christopherson's sole claim against CEC is based on the VPPA. Congress enacted the VPPA in 1988 following a newspaper's publication of a profile of then-Supreme Court nominee Judge Robert H. Bork "based on the titles of 146 films his family had rented from a video store." Sen. Rep. 100-599, at 5 (1988). The purpose of the VPPA is "[t]o preserve personal privacy with respect to the rental, purchase, or delivery of video

3

tapes or similar audio visual materials." *Id.* at 1. Relevant here, to state a VPPA claim, Christopherson must plausibly allege that "[a] video tape service provider . . . knowingly disclose[d], to any person, personally identifiable information concerning any consumer of such provider."[3] 18 U.S.C. § 2710(b).

The Court first considers whether CEC is a "video tape service provider" under the VPPA. In construing a statute, the Court looks to "the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (citation omitted). When interpreting a statute, courts question "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *United States v. Kowal*, 527 F.3d 741, 746 (8th Cir. 2008) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). In doing so, courts consider the construction of the statute as a whole and may consult dictionary definitions. *Robinson*, 519 U.S. at 341–42. Courts only look beyond the statute's text if the text is ambiguous. *Kowal*, 527 F.3d at 746 (citation omitted).

The VPPA defines "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of *rental, sale, or delivery* of prerecorded video cassette tapes or similar audio visual materials . . . ." 18 U.S.C.

---

[3] A "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). CEC does not dispute that the complaint sufficiently alleges that Christopherson is a consumer under the VPPA.

4

§ 2710(a)(4) (emphasis added). CEC contends that it does not rent, sell, or deliver audio visual materials that are similar to prerecorded video cassette tapes. Christopherson maintains that CEC is a "video tape service provider" under the VPPA because CEC (1) sells access to movies, (2) delivers movies to consumers in CEC's theaters, and (3) delivers movie trailers on its website.[4] (ECF No. 37 at 17–18.)

For the reasons below, the Court concludes that the terms "sale" and "delivery" in the VPPA require a transfer of some possessory interest in the audio visual materials being sold or delivered. In doing so, the Court agrees with the reasoning in *Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921, 925 (C.D. Cal. 2023), *on appeal*, No. 23-3882 (9th Cir. Nov. 30, 2023).

*"Sale."* Under the VPPA, the term "sale" suggests a transfer of possessory interest. "Sale" is defined as "the act of selling[,] specifically: the transfer of ownership of and title to property from one person to another for a price." "Sale" (noun) df. 1, Merriam-Webster Online Dictionary, at https://www.merriam-webster.com/dictionary/sale [https://perma.cc/D7EH-FCM6]. "Sell," in turn, is defined as "to give up (property) to another for something of value (such as money)." "Sell" (verb) df. 2a(1), Merriam-Webster Online Dictionary, at https://www.merriam-webster.com/dictionary/sell [https://perma.cc/VX75-3G8H]; *see* "sell" (verb) df., Cambridge Online Dictionary, at

---

[4] Christopherson does not contend that CEC rents movies under the VPPA.

5

https://dictionary.cambridge.org/us/dictionary/english/sell [https://perma.cc/4UBR-ADJ2] (defining "sell" as "to give something to someone else in return for money").

The complaint does not allege that CEC sells video cassette tapes or similar audio visual materials. It claims that "[b]y selling *tickets* to prerecorded movies, providing trailers to those movies, and delivering those movies to consumers in movie theaters, CEC is a 'video tape service provider' under the VPPA." (Compl. ¶ 19 (emphasis added); *see id.* ¶¶ 3, 6, 20, 22).) Under the VPPA, the sale must be of "prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Tickets to watch movies in a theater are neither. *See Osheske*, 700 F. Supp. 3d at 925. "When consumers purchase a movie ticket, they are purchasing a license to enter the theater premises at a particular time and, in effect, attend a *public event*." *Id.*; *see* "ticket" df. 1, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/ticket [https://perma.cc/EJ8R-HU3V] (defining "ticket" as "a certificate or token showing that a fare or admission fee has been paid").

Christopherson argues that "sales are not limited to a commodity in which a transfer of physical property occurs—sales routinely include services or entertainment." (ECF No. 37 at 19.) While that is true as a general proposition, the Court must construe the term "sale" in its context here, under the VPPA. *See United States v. Jungers,* 702 F.3d 1066, 1069 (8th Cir. 2013) ("In interpreting the statute at issue, '[w]e consider not only the bare meaning' of the critical word or phrase 'but also its placement and purpose in

6

the statutory scheme.'" (citation omitted)). And under the VPPA, the term "sale" applies to video tapes or "similar audio visual materials." *See Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 851 (N.D. Cal. 2022) ("Courts have generally construed 'similar audio visual materials' broadly . . . . The scope of the statute is not, however, unbounded.")

The "similar audio visual materials" constriction matters. Under this language, the VPPA does not cover video tape service providers that sell *access* to such materials or that sell services or entertainment. *See Osheske,* 700 F. Supp. 3d at 925 ("Movie theaters do not rent movies, sell movies, or deliver movies; they 'show' movies."). The Court concludes that movie theater operators do not sell movies to consumers in theaters. *See id.*; *Garza v. Alamo Intermediate II Holdings, LLC*, No. 23-CV-05849-VC, 2024 WL 1171737, at *1 (N.D. Cal. Mar. 19, 2024) ("Alamo [a movie theater operator] does not rent or sell movies to moviegoers."), *on appeal*, No. 24-2165 (9th Cir. Apr. 8, 2024).

*"Delivery" of movies in theaters.* Next, Christopherson asserts that CEC is a video tape service provider because it delivers movies to consumers in theaters. Dictionaries define "deliver" as "to take and hand over to or leave for another."[5] "deliver" (verb) df. 2a, Merriam-Webster Online Dictionary, at https://www.merriam-webster.com/dictionary/deliver [https://perma.cc/DUR3-HJLH]; *see* "deliver" (verb) df., Cambridge Online Dictionary, at https://dictionary.cambridge.org/us/dictionary/english/deliver

---

[5] The VPPA uses the term "delivery," which dictionaries define as "the act or manner of delivering something." "delivery" (noun), Merriam-Webster Online Dictionary, at https://www.merriam-webster.com/dictionary/delivery [https://perma.cc/GUY6-7VXG]. So the Court considers definitions of "deliver."

7

[https://perma.cc/3CUN-XFLZ] (defining "deliver" as "to take goods, letters, packages, etc. to people's houses or places of work"). This definition aligns with "deliver[ing]" video cassette tapes or similar audio visual materials to a location of the consumer's choosing. *Cf. Osheske*, 700 F. Supp. 3d at 926 n.3 ("[W]ith delivery through streaming, the consumer is given a possessory interest that allows them to view the videos in their homes or at the place of their choosing."). Christopherson does not claim that CEC hands over any possessory interest in the movie it shows in a theater.

Next, Christopherson argues that "deliver" under the VPPA is not limited to possessory interest, noting that "deliver" is also defined as "to send, provide, or make accessible to someone electronically." "deliver" (verb) df. 2c, Merriam-Webster Online Dictionary, at https://www.merriam-webster.com/dictionary/deliver [https://perma.cc/DUR3-HJLH]. But defining "deliver" to mean "send" "does not cover movie theaters—it would be quite a stretch to say that movie theaters 'send' movies by projecting them onto a screen." *Garza*, 2024 WL 1171737, at *1.

This conclusion is bolstered by other district courts considering the issue. Courts have distinguished streaming services from movie theaters based in part on the VPPA's stated purpose of protecting consumer privacy. As courts have noted, "movie theaters are places of public accommodation, and [] individuals there do not enjoy the same privacy rights offered in a private home." *Walsh v. Cal. Cinema Invs. LLC*, No. 2:23-CV-09608-ODW (AJRX), 2024 WL 3593569, at *4 (C.D. Cal. July 29, 2024) (citing *Paris Adult*

8

*Theatre I v. Slaton*, 413 U.S. 49 (1973); *see Osheske*, 700 F. Supp. 3d at 925 (similar). In contrast, "streaming services typically send audio visual materials to private devices, often in private homes."[6] *Walsh*, 2024 WL 3593569, at *4.

For example, in *In re Hulu Privacy Litigation*, the court applied the VPPA to a streaming service. No. C 11–03764 LB, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012). In its analysis, the court noted that "Congress's concern with privacy and protecting the confidentiality of an individual's choices is relevant context to the Senate Report's discussion of 'similar audio visual materials, such as laser discs, open-reel movies, and CDI technologies.'" *Id.* at *6 (quoting S. Rep. 100–599 at 12). The Senate's examples suggest that "similar audio visual materials" are those that a consumer can choose to view in privacy, thus supporting possessory interest. This Court finds no inconsistency between cases that found streaming services to be video tape service providers and those that declined to do so for movie theaters. *See Osheske*, 700 F. Supp. 3d at 927; *Walsh*, 2024 WL 3593569, at *4.

---

[6] Christopherson relies on *Goldstein v. Fandango Media, LLC*, in which Fandango allegedly disclosed consumers' personally identifiable information when they watched video clips or purchased movie tickets on its website. No. 22-80569-CIV-MARRA, 2023 WL 3025111, at *2 (S.D. Fla. Mar. 7, 2023). Fandango did not own or operate movie theaters; it allegedly delivered video clips, sold movie tickets, and acted as a "modern-day video store." *Id.* at *1. The court declined to dismiss the complaint because it needed to "determine the nature of [Fandango's] business," which required a factual inquiry beyond the pleadings. *Id.* at *3. And so "selling movie tickets, on its own, was insufficient to give rise to [video service tape provider] status" in *Goldstein*. *Walsh*, 2024 WL 3593569, at *5; *see id.* ("*Goldstein* does not contradict the holding from *Osheske*, that a movie theater sells only 'a license to . . . attend a public event.'" (citing *Osheske*, 700 F. Supp. 3d at 925)).

Christopherson also relies on business-context definitions of "deliver" as "to provide a service" and "to achieve, provide, or produce something."[7] "deliver" (verb) Business English dfs. 2–3, Cambridge Online Dictionary, at https://dictionary.cambridge.org/us/dictionary/english/deliver [https://perma.cc/3CUN-XFLZ]. As explained above, the VPPA covers the sale or delivery of "audio visual materials," not services. *See Garza*, 2024 WL 1171737, at *1 (holding that the VPPA "refers to the delivery of a specific kind of good ('audiovisual materials'), not the delivery of a result or outcome"); *Walsh*, 2024 WL 3593569, at *4 (agreeing with *Osheske* and *Garza* and "conclud[ing] that movie theaters do not 'deliver' audio visual materials for the purposes of the VPPA").

The legislative history also supports the Court's construction of the statute. Congress enacted the VPPA to "preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials."[8] S. Rep. 100–599,

---

[7] Cambridge Online Dictionary provides examples of this business-context definition, *e.g.*, "The company is working tirelessly to *deliver* improved services," and "price wars we see among retailers are a direct result of their need to . . . *deliver* profits." "deliver" (verb) Business English dfs. 2–3, Cambridge Online Dictionary, at https://dictionary.cambridge.org/us/dictionary/english/deliver [https://perma.cc/3CUN-XFLZ] (emphasis added).

[8] The Senate Report on the VPPA explains:
> Acknowledging the relationship between the right of privacy and intellectual freedom is a central part of the [F]irst [A]mendment . . . . Protecting an individual's choice of books and films is a second pillar of intellectual freedom under the [F]irst [A]mendment. In *Stanley v. Georgia*, 394 U.S. 557, 565 (1969), the Court declared, "If the First Amendment

10

at 1; *see Osheske*, 700 F. Supp. 3d at 926 ("[N]othing in the legislative record . . . suggest[s] that the VPPA was intended to cover public acts." (citing S. Rep. 100-599, at 5–6; 134 Cong. Rec. S16312-01, 1988 WL 177971). Christopherson points to nothing suggesting that Congress intended that the VPPA apply to movie theaters at either its enactment or its amendment in 2013.[9]

Citing references to the term "records" in the legislative history, Christopherson argues that Congress was concerned about extending privacy protection to consumer records. *E.g.*, S. Rep. 100-599, at 2. She surmises that Congress did not expressly list movie theaters when the VPPA was enacted because movie theaters seldom kept records about their customers. The Court is unpersuaded. "[M]ovie theaters were ubiquitous when the VPPA was enacted in 1988 and amended in 2013. Yet there is no suggestion from the statutory language or legislative history that Congress intended to extend a right to privacy to the public act of attending a movie theater showing." *Osheske*, 700 F. Supp. 3d at 927.

---

means anything, it means that a State has no business telling a man, sitting alone in his house, what books he may read or what films he may watch."

S. Rep. 100–599, at *4; *see also id.* at *5 (noting Senator Leahy's remarks in a Senate committee meeting on Judge Bork's nomination, that "[i]t is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.").

[9] The Video Privacy Protection Act Amendments Act of 2012 "clarif[ied] that a video tape service provider may obtain a consumer's informed, written consent on an ongoing basis and that consent may be obtained through the Internet." 126 Stat. 2414, Pub. L. 112-258 (2013). It "d[id] not change the scope of who is covered by the VPPA[.]" 158 Cong. Rec. H6849-01, H6850 (Dec. 18, 2012).

11

*"Deliver" movie trailers.* Finally, Christopherson alleges that, apart from delivering movies in theaters, CEC violated the VPPA in connection with delivering movie trailers to consumers through its website. The Court is unpersuaded on this point as well. Under the VPPA, a "video tape service provider" must be *"engaged in the business . . .* of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added). To be "engaged in the business" of delivering video content such that a defendant's activities rise to the level of "video tape service provider" requires that the plaintiff sufficiently plead that the defendant's involvement "connotes 'a particular field of endeavor'" or "a focus of the defendant's work." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (collecting dictionary definitions) (finding a smart TV manufacturer was a "video tape service provider" under the VPPA). To be engaged in the business of delivering audio visual materials, "the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *Id*. Developers of products or services "that might be peripherally or passively involved in video content delivery do not fall within the statutory definition of a video tape service provider." *Id.* at 1221–22; *see Tawam v. Feld Ent. Inc.*, 684 F. Supp. 3d 1056, 1060-61 (S.D. Cal. July 28, 2023) (dismissing VPPA claim where complaint allegations did not support an inference that the online videos viewed by plaintiffs were more than peripheral to defendant's monster-truck-event

business or that defendant's website is significantly tailored to the purpose of conveying those videos).

The complaint alleges that CEC is a video tape service provider "because it provides movie trailers to consumers in order to advertise the movies it sells."[10] (Compl. ¶ 68.) Christopherson does not allege or argue that the focus of CEC's business is showing movie trailers on its website. Similarly, she does not allege that the movie trailers are anything more than marketing for CEC—a business that is otherwise not a video tape service provider. *See Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 994 (S.D. Cal. 2023) ("That the videos are used for marketing purposes, as admitted in the [complaint], demonstrates that they themselves are not Defendant's product and therefore are only peripheral to Defendant's business."). As a result, the trailers on CEC's website do not make CEC a video tape service provider. *See Walsh*, 2024 WL 3593569, at *5 ("[T]he presence of the trailers on Defendants' website has no relation to Walsh's VPPA claim.").

For these reasons, the Court agrees with courts that have (universally) dismissed VPPA claims against movie theater operators. *See Osheske*, 700 F. Supp. 3d at 922 ("To expand the VPPA to cover the *public* act of attending a movie theater is a bridge too far

---

[10] In contrast, the complaint also alleges that CEC is a video tape service provider "because it *sells movie tickets* to consumers on the CEC Website and *delivers pre-recorded movies to consumers in movie theaters*, thereby "engag[ing] in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." (Compl. ¶ 67 (emphasis added).)

and is patently inconsistent with both the plain language and legislative history of the VPPA itself."); *Garza*, 2024 WL 1171737; *Walsh*, 2024 WL 3593569. Because CEC is not a "video tape service provider" under the VPPA, Count I is dismissed.[11]

## CONCLUSION

Based on the above and on all the files, records, and proceedings herein, Defendant Cinema Entertainment Corporation's Motion to Dismiss Plaintiff's Complaint (ECF No. 18) is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 17, 2024

BY THE COURT:

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge

---

[11] Because the Court finds that CEC is not subject to the VPPA, it does not address the other elements of the VPPA claim or CEC's constitutional challenge of the VPPA.